

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| CAMPAIGN FOR SOUTHERN EQUALITY; FAMILY EQUALITY COUNCIL; DONNA PHILLIPS; JANET SMITH; KATHRYN GARNER; SUSAN HROSTOWSKI; JESSICA HARBUCK; BRITTANY ROWELL; TINORA SWEETEN-LUNSFORD; and KARI LUNSFORD, | § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 3:15cv 578 DPJ-FKB |
| The MISSISSIPPI DEPARTMENT OF HUMAN SERVICES and RICHARD BERRY, in his official capacity as its Executive Director; PHIL BRYANT, in his official capacity as Governor of the State of Mississippi; JIM HOOD, in his official capacity as Mississippi Attorney General, | § § § § § § § § § | |
| Defendants. | § | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Campaign for Southern Equality, Family Equality Council, Donna Phillips,

Janet Smith, Kathryn Garner, Susan Hrostowski, Jessica Harbuck, Brittany Rowell, Tinora

Sweeten-Lunsford, and Kari Lunsford complain and allege:

### INTRODUCTION

1.      This lawsuit is being filed to redress the significant deprivation of constitutional

rights caused by one sentence in Mississippi's adoption law which reads as follows: "Adoption

by couples of the same gender is prohibited." Miss. Code Ann. § 93-17-3(5) (the "Mississippi

Adoption Ban"). Those nine words in Mississippi's statutory code not only nullify, for gay

people only, all of the factors otherwise considered relevant in ensuring that adoptions in

Mississippi are performed in the best interests of the child, but blatantly discriminate against gay couples who are now legally married.

2.     The consequences of the Mississippi Adoption Ban for gay couples and their families are profound and far-reaching.   As the United States Supreme Court recently recognized, "gays and lesbians can create loving, supportive families" and "many same-sex couples provide loving and nurturing homes to their children." *See Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2600 (2015).  The Supreme Court expressed a similar sentiment two years earlier in *United States* v. *Windsor*, when, in striking down the key provision of the Defense of Marriage Act, it observed that denying recognition under federal law to married gay and lesbian couples "humiliates tens of thousands of children now being raised by same-sex couples" and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives."  133 S. Ct. 2675, 2694 (2013).

3.     Those same principles, of course, are as true for children in Mississippi as they are for children anywhere else in this country.  According to the 2010 Census, 26% of the 3,484 gay couples living in Mississippi are raising children under age 18 in their homes.  *See % of Same-sex Couples Raising Children in Top Metro Areas*, The Williams Institute (May 20, 2013), http://williamsinstitute.law.ucla.edu/research/census-lgbt-demographics-studies/infographic-msas-may-2013/ (last updated July 26, 2013).  By 2014, that number had increased so that at least 29% of gay couples in Mississippi (or 996 households) are now raising 1,401 children. Gary J. Gates, *Same-sex Couples in Mississippi: A Demographic Summary*, The Williams Institute  (Dec.  2014),  http://williamsinstitute.law.ucla.edu/wp-content/uploads/MI-same-sex-

couples-demo-dec-2014.pdf. This is the highest percentage of gay couples raising children of any state in the nation. *Id.*

4. Yet, despite these numbers, Mississippi is the last state that explicitly bans gay couples from adopting without regard for their qualifications as parents or the best interests of the child. *See Suzy Khimm, The New Nuclear Family: What Gay Marriage Means for the Future of Parenthood*, New Republic (July 23, 2015), http://www.newrepublic.com/article/ 122349/new-nuclear-family; Movement Advancement Project, *Equality Maps: Foster and Adoption Laws, Joint Adoption* (July 21, 2015), http://www.lgbtmap.org/equality-maps/foster_and_adoption_laws/joint_adoption_laws. Courts in Arkansas and Florida have explicitly struck down analogous bans on gay couples adopting or fostering children. *Cole* v. *Ark. Dep't of Human Servs.*, No. CV 2008-14284, 2010 WL 6451862 (Ark. Ct. App. May 10, 2010), *aff'd* 380 S.W.3d 429 (2011); *Fla. Dep't of Children & Families* v. *Adoption of X.X.G.*, 45 So. 3d 79, 81 (Fla. Dist. Ct. App. 2010). Only last month, the Louisiana Supreme Court recognized that the *Obergefell* decision, which had the effect of nullifying the provision of the Louisiana Constitution barring gay marriage, also rendered unconstitutional Louisiana's ban on gay and lesbian couples adopting. *See Costanza* v. *Caldwell*, No. 2014–CA–2090, 2015 WL 4094655 (La. July 7, 2015) (dismissing as moot on the basis of *Obergefell* the appeal of a writ of adoption for the female spouse of a child's biological mother). *See id.* at *4 (concurring opinion of Justice Guidry describing the factual background of the case). Just a few months ago, the Florida legislature passed, and the Governor signed into law, a bill to formally repeal the adoption ban there. H.B. 7013, 2015 Leg. (Fl. 2015). And last week, a Nebraska court struck down the Nebraska Department of Health and Human Services' ban on gays and lesbians' ability

3

to foster or adopt wards of the state.[1] *Stewart v. Heineman*, No. CI 13-3157 (Neb. Dist. Ct. Lancaster Cty. Aug. 5, 2015).

5.      Of course, not all families are the same.  They differ in size, cultural heritage, religion, and economic means.  Some are headed by parents who planned, were prepared for, and wanted children—others are not.  Some children, regardless of their parents' sexual orientation, come from single-parent, divorced, or blended families.  And some children now have married lesbian and gay parents who live in committed and loving relationships in Mississippi.  The question before this Court is not what kind of family is best.  That is not a question for this or any court to decide.  Rather, the question here is whether there is a legal basis for depriving many children in Mississippi of the protections and security of having two legal parents.

6.      The Mississippi Adoption Ban writes inequality into Mississippi law by requiring that married gay and lesbian couples and parents be treated differently than all other married couples in Mississippi, unequivocally barring them from adoption without regard to their circumstances.  As a consequence, the equal dignity of hundreds of families and thousands of children in Mississippi is disrespected and the significant and concrete rights, benefits, and duties that come with legal parentage are denied.  The Mississippi Adoption Ban means that "thousands of . . . children [are] actually being raised in homes . . . [with] only one legal parent, not the two who want them."  *Matter of Jacob*, 660 N.E.2d 397, 398 (N.Y. 1995) (Kaye, C.J.).  The Mississippi Adoption Ban is an outdated relic of a time when courts and legislatures believed that it was somehow okay to discriminate against gay people simply because they are gay.  But

---

[1]    And just yesterday, the Mexican Supreme Court struck down a law in the Mexican state of Campeche that banned gay and lesbian couples from adopting children.  *See, e.g.*, Michael K. Lavers, *Mexican Supreme Court Strikes Down Gay Adoption Ban*, Washington Blade (Aug. 11, 2015), http://www.washingtonblade.com/2015/08/11/mexican-supreme-court-strikes-down-gay-adoption-ban/.

under the Supreme Court's decisions in *Obergefell* and *Windsor*, such discrimination against children because their parents happen to be gay is blatantly unconstitutional.

**PARTIES**

A.   **Plaintiffs**

The Campaign for Southern Equality

7.     The Campaign for Southern Equality was incorporated in 2011, in order to advocate for the full equality of lesbian, gay, bisexual, and transgender ("LGBT") people in American life and to increase public support for their rights. Based in Asheville, North Carolina, the Campaign for Southern Equality works throughout the South by providing free legal clinics and resources to help LGBT Southerners protect their rights; engaging in litigation to vindicate the rights guaranteed by the Constitution of the United States; and providing organizational support and training to local LGBT leaders. Since 2012, the Campaign for Southern Equality has worked actively with LGBT people across Mississippi. These efforts have included public advocacy promoting marriage equality, town hall events about LGBT equality, and free legal clinics. The Campaign for Southern Equality has members in the State of Mississippi.

8.     A court in this district described the Campaign for Southern Equality as "a non-profit advocacy group based in Asheville, North Carolina, that works across the South to promote 'the full humanity and equality of lesbian, gay, bisexual, and transgender people in American life,'" and recently recognized the Campaign for Southern Equality as a proper institutional plaintiff having standing to sue on behalf of its members in a lawsuit challenging Mississippi's laws banning marriage between gay couples. *See Campaign for S. Equal.* v. *Bryant*, 64 F. Supp. 3d 906, 914, 917–18 (S.D. Miss. 2014) ("CSE also has standing to sue on behalf of its members. . . . The allegations in the complaint support that CSE's members would independently have standing to seek the relief described in this suit alongside the individual

5

plaintiffs, and would be satisfied by a judgment against these defendants. It also is evident that CSE's mission is aligned with its goals in this suit."), *aff'd*, No. 14-60837, 2015 WL 4032186 (5th Cir. July 1, 2015).

<u>Family Equality Council</u>

9.      Family Equality Council was founded in 1979, in order to connect, support, and represent parents who are lesbian, gay, bisexual, transgender, and queer ("LGBTQ") and their children. It is the only national organization exclusively dedicated to securing justice and equality for LGBTQ parents and their children by advancing legal and social justice for all families. Based in Massachusetts, Family Equality Council has multiple offices and serves its constituents throughout the country, including Mississippi, through its Southern Advisory Council. Family Equality Council has worked to advance equality for LGBTQ parents and their children across the South and since 2012 has focused its efforts in Mississippi. In October 2014, the organization partnered with the University of Mississippi School of Law to hold its first legal services clinic for low-income LGBTQ parents in Jackson, Mississippi. The second such clinic is scheduled for October 2015. Family Equality Council holds seminars and other community-building events throughout the South, including in Mississippi, to educate prospective LGBTQ parents about their family-building options.

<u>Donna Phillips and Janet Smith</u>

10.      Donna Phillips and Jan Smith have been together as a couple since 1995 and were legally married in Maryland on August 1, 2013. They are residents of Rankin County, Mississippi, and have lived in Mississippi for their entire lives.

11.      Donna has served with distinction in various positions in the military, including as a company commander of a unit in the Mississippi Army National Guard responsible for the

6

immediate response to Hurricane Katrina.  She is currently a Captain in the Mississippi Air National Guard and holds a Master's Degree in Business Administration from Mississippi State University.

13.     Jan has been employed by the Mississippi Department of Mental Health for more than 20 years and holds a Master's Degree in Education from Mississippi State University.

13.     Both women felt a strong desire to be parents and, in 2007, Donna gave birth to their daughter H.M.S.P.  Because of the Mississippi Adoption Ban, only Donna's name is listed on H.M.S.P.'s birth certificate.  H.M.S.P. has no other legal parent.

14.     Jan has been a parent to H.M.S.P. since her birth in every sense of the word except under the law, and H.M.S.P. knows and loves both Jan and Donna as her parents.  Jan shares parenting responsibilities for H.M.S.P. equally with Donna, with the exception of the times when Donna has been called to perform military duties outside of Mississippi and Jan has had to bear most of those responsibilities on her own.

15.     Jan and Donna have a happy, bright, and well-adjusted eight-year-old daughter whom they both love very much.  Jan and Donna are exemplary parents who have mutually provided H.M.S.P. with a childhood full of love and support.  Both are actively involved in their daughter's life and are dedicated participants in the Parent Teacher Organization at H.M.S.P.'s school.

16.     Jan and Donna have to worry about Jan's parental rights being challenged under the law, especially because Donna's military duties frequently require her to be away from home and because there is the possibility that she could be killed or seriously injured in the line of duty.  In the event of a stressful emergency situation, Jan and Donna would not want their

daughter to have to deal with the fact that Mississippi law only recognizes one of her moms as her legal parent.

17.     Jan and Donna want Jan to adopt H.M.S.P. so that her two actual parents will be her legal parents. H.M.S.P. also wishes to be adopted by Jan.

18.     Because of the Mississippi Adoption Ban, Donna and Jan's efforts to take the first step in the adoption process have been unsuccessful. Specifically, every single social worker they have tried to engage to perform a home study has refused, citing the Mississippi Adoption Ban. *See* Miss. Code Ann. § 93-17-3(6). Several social work agencies told Donna and Jan that not only would a home study for a gay couple trying to adopt in Mississippi be useless, but they feared it would endanger their organizations' standing with the State of Mississippi.

Kathryn Garner and Susan Hrostowski

19.     Kathryn Garner and Susan Hrostowski have been together as a couple for nearly 26 years. They had a religious ceremony 22 years ago, and were legally married last summer in an Episcopalian wedding held at Washington National Cathedral in Washington, D.C. At their wedding, their 15-year-old son, H.M.G., served as their best man. They are residents of Forrest County, Mississippi.

20.     Kathryn grew up in Hattiesburg, Mississippi. She holds a Bachelor's Degree in Community and Regional Planning from the University of Southern Mississippi and has been the Executive Director of the AIDS Services Coalition for the last 10 years, an organization that provides services to people living with HIV/AIDS in southern Mississippi, with an emphasis on helping the homeless population.

21.     Susan grew up in Gulfport, Mississippi. She holds a Bachelor's Degree in Psychology from the University of Southern Mississippi, a Master of Divinity from Virginia

8

Theological Seminary, and a Master's Degree and a Ph.D in Social Work from Tulane University. Susan was ordained as an Episcopal priest in 1988 and is the vicar of St. Elizabeth's Episcopal Church in Collins, Mississippi. She is also an Associate Professor in the School of Social Work at the University of Southern Mississippi.

22.     Kathy and Susan together decided to have a child as equal parents and that Kathy would carry their child. Kathy gave birth to their son H.M.G. 15 years ago, just six weeks before the Mississippi Adoption Ban went into effect. Kathy and Susan consulted with a lawyer shortly after H.M.G.'s birth and were advised that, because of the Mississippi Adoption Ban, it would be impossible for Susan to adopt H.M.G. under Mississippi law.[2]

23.     Although both Kathy and Susan have together parented H.M.G. since birth, Kathy is the only legal parent on his birth certificate. H.M.G. has no other legal parent.

24.     H.M.G., who is now 15, is thriving by every measure. He earned straight A's in his freshman year of high school, was the starting quarterback for his high school football team, and spent part of this past summer as a counselor at a camp for children with intellectual disabilities.

25.     Kathy and Susan love H.M.G. very much and never want to worry about Susan's parental rights being challenged under the law. Kathy and Susan want Susan to adopt H.M.G. and H.M.G. wishes to be adopted by Susan.

---

[2]     The advice given to Kathy and Susan regarding the effect of the Mississippi Adoption Ban is made without the intent to, and does not, waive attorney-client privilege or any other applicable privilege.

<u>Jessica Harbuck and Brittany Rowell</u>

26.     Jessica Harbuck and Brittany Rowell have been together as a couple since 2010 and are engaged to be married.  They are planning to wed in Jackson, Mississippi in January, 2016.  They are residents of Rankin County, Mississippi.

27.     Raising children together is an important part of what Jessica and Brittany look forward to in marriage.  They hope to jointly adopt children through the foster care system so as to be able to provide a child in need with a loving and stable home.  There are currently approximately 100 children in Mississippi who are in foster care and legally available for adoption, but who have not been matched with parents who can adopt them.

28.     Jessica and Brittany are well-suited to adopt children, both financially and emotionally.  Jessica is currently employed as a civil engineer while also pursuing a Master's Degree in Environmental Engineering at Jackson State University.   She will graduate in December 2015.  Brittany is an office manager.  She also has extensive experience working with infants at a daycare and as a nanny.

<u>Tinora Sweeten-Lunsford and Kari Lunsford</u>

29.     Tinora ("Tina") Sweeten-Lunsford and Kari Lunsford have been together as a couple for more than 20 years, had a commitment ceremony 19 years ago, and were married two years ago in Washington State.  They moved to Starkville, Mississippi over 12 years ago and have made Mississippi their home.  They are residents of Oktibbeha County.

30.     Tina has a Bachelor's Degree in Anthropology from Western Washington University and a Master's Degree in Nonprofit Management from Hamline University.  Kari has a Bachelor's Degree in Music Composition and Theory from Coe College and a Doctorate of Veterinary Medicine from the University of Minnesota.  Tina is currently the Executive Director

10

of the Columbus Arts Council and Kari is a veterinary clinician and professor at Mississippi State University.

31.     Tina and Kari have longed to adopt children for many years.  Because of Tina's past experiences working with children with disabilities, including as a Program Director at the Mississippi State Early Childhood Institute, they are willing and able to adopt children with special needs.

32.     Tina and Kari took concrete steps to adopt in Mississippi, including speaking with social workers and attending a training session for foster parents run by the Mississippi Department of Human Services ("MDHS").  However, at the training session, which was the first step necessary to qualify as a foster parent, a MDHS social worker told them that they were not eligible to become foster parents or to adopt children in Mississippi because they are lesbians.

33.     In further discussions, the MDHS social worker conceded that there are children in the MDHS system who cannot be matched with suitable foster parents because of their special needs.  The MDHS social worker stated that Tina and Kari could potentially be considered as foster parents of such a child, but only if just one of them pursued the adoption as a "single" person and if they agreed to live apart while MDHS reviewed their application, including for at least six months while MDHS completed a home study.  Understandably, Tina and Kari were not willing to agree to such an irrational, unjust, and demeaning condition.  It simply would not make any sense to do a home study of a home when only one of the two married women who intend to raise the adopted child together is present.

**B.    Defendants**

34.    Defendant Mississippi Department of Human Services is an agency of the State of Mississippi, designated by Miss. Code Ann. §§ 93-17-1 through 93-17-31 to establish procedures for handling adoptions within Mississippi.  18-6:1 Miss. Code R. § G-1.II.  Within MDHS, the Adoption Unit of the Division of Family and Children's Services ("DFCS") has responsibility for adoptive placements made by and through MDHS. *Id.*

35.    Defendant Richard "Rickey" Berry is the Executive Director of the Mississippi Department of Human Services, and is being sued here in his official capacity.  Mr. Berry is the "chief administrative officer of the [MDHS]," and is charged by state law with the duty of "establish[ing] the organizational structure of the Mississippi Department of Human Services which shall include the creation of any units necessary to implement the duties assigned to the department and consistent with specific requirements of law, including . . . [the] Office of Family and Children's Services."  Miss. Code Ann. §§ 43-1-2(2)–(5)(a).  The Office of Family and Children's Services, in turn, is responsible for the "development, execution and provision of services in the following areas:  (a) protective services for children; (b) foster care; (c) adoption services." Miss. Code Ann. § 43-1-51.

36.    Defendant Phil Bryant is the Governor of the State of Mississippi and is being sued here in his official capacity.  Governor Bryant is the chief executive of the State of Mississippi and is responsible for ensuring compliance with state law.  Governor Bryant also bears responsibility for the formulation and administration of the policies of the executive branch, including administrative agency policies relating to adoption.  Governor Bryant appoints the Executive Director of the Department of Human Services, the administrative body that

manages adoption procedures within the State of Mississippi.  Miss. Code Ann. § 43-1-2(2).
Governor Bryant was and is acting under color of state law at all times relevant to this complaint.

37.     Defendant Jim Hood is the Attorney General of the State of Mississippi and is
being sued here in his official capacity.  Attorney General Hood is the chief law enforcement
officer of the State of Mississippi and is responsible for enforcing and insuring compliance with
state law.  Attorney General Hood was and is acting under color of state law at all times relevant
to this complaint.

38.     Each of the Defendants is charged with enforcing the laws of the State of
Mississippi related to adoptions.

39.     Upon information and belief, the Defendants and other officers of the State of
Mississippi interpret the Mississippi Adoption Ban to prohibit the adoption of children by gay
and lesbian couples like Plaintiffs in this case.

40.     Under Mississippi law, a home study is required before a child can be adopted by
someone other than a relative or stepparent of the child.  The home study must be performed by
MDHS or a licensed adoption agency.  Miss. Code Ann. § 93-17-11.  Upon information and
belief, MDHS and a number of licensed adoption agencies are refusing, because of the
Mississippi Adoption Ban, to conduct home studies for married gay and lesbian couples who
wish to adopt a child.

## JURISDICTION AND VENUE

41.     This action arises under the Constitution of the United States and the laws of the
United States, including 42 U.S.C. § 1983.  This Court therefore has jurisdiction pursuant to 28
U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

42.     Venue is proper under 28 U.S.C. § 1391 because Defendant MDHS's offices are in this district and Defendant Berry, Defendant Bryant, and Defendant Hood all reside in the State of Mississippi.  Venue is also proper because a substantial part of the events giving rise to this action occurred in this district.

43.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

44.     This Court has personal jurisdiction over Defendants because they are domiciled in Mississippi.

## FACTS

**A.     The Origins of the Mississippi Adoption Ban**

45.     Mississippi, like every other state in this nation, has a strong public interest in seeing that as many children as possible get adopted into stable, loving homes.  *See, e.g.,* Adoption and Safe Families Act of 1997, Pub. L. 105-89, 111 Stat. 2115 (articulating policy to encourage permanent adoptive homes); Miss. Code Ann. § 43-15-13(8) (advising that if a child in foster care cannot be reunified with a parent, the placement must be the "best available placement to provide a permanent living arrangement for the child.").  It therefore makes sense that eligibility to adopt in Mississippi is—with the irrational exception of gay couples—quite broad.  Under Mississippi law and as published on the MDHS website, single persons and married couples are eligible to adopt in Mississippi, provided they are at least 21 years of age, have "income and insurance sufficient to meet the additional needs of an adopted child," and "meet accepted emotional, intellectual and psychological standards to be good parents."  *Who*

*Can Adopt*, MDHS, http://www.mdhs.state.ms.us/family-childrens-services/programs-dfcs/adopt-a-child/who-can-adopt/.

46.     Mississippi courts likewise focus on the best interests of the child when determining whether to approve adoptions. Indeed, "Mississippi has consistently and repeatedly held that the best interests of the child is a *polestar consideration* in the granting of any adoption." *In re Adoption of D.N.T.*, 843 So. 2d 690, 719 (Miss. 2003) (MacRae, P.J., dissenting) (emphasis added) (internal quotation marks omitted).    In determining the best interests of the child, Mississippi courts most often look to the so-called "*Albright* factors":  (1) "[A]ge . . . health, and sex of the child"; (2) "continuity of care"; (3) "parenting skills" and "willingness and capacity to provide primary child care"; (4) "the employment of the parent and responsibilities of that employment"; (5) "physical and mental health and age of the parents"; (6) "emotional ties of parent and child"; (7) "moral fitness of parents";[3] (8) "the home, school and community record of the child"; (9) "the preference of the child"; (10) "stability of home environment and employment of each parent"; and (11) "other factors relevant to the parent-child relationship." *Albright* v. *Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).   Under this analysis, all the factors must be considered, and "[d]ifferences in religion, personal values and lifestyles should not be the sole basis for custody decisions."  *Id*.  While the *Albright* factors were developed in the custody context, Mississippi courts have applied them to adoption

---

[3]    While Mississippi can and should consider the moral fitness of parents in making decisions regarding adoption, the Supreme Court has held that "moral disapproval" of gay people is not a legitimate government interest. *See United States* v. *Windsor*, 133 S. Ct. 2675, 2693 (2013) ("Were there any doubt of [DOMA's] far-reaching purpose [to express moral disapproval], the title of the Act confirms it: The Defense of Marriage."); *see also Lawrence* v. *Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) ("Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" (quoting *Romer* v. *Evans*, 517 U.S. 620, 633 (1996))).

proceedings. *See, e.g., Natural Mother* v. *Paternal Aunt*, 583 So. 2d 614, 619 (Miss. 1991) (applying *Albright* factors to best interests analysis in adoption context).

47.     The origins of the Mississippi Adoption Ban are illustrative of the kinds of improper animus that have all too often motivated laws that establish de jure discrimination against gay men and lesbians.

48.     In 1999, the Mississippi Supreme Court decided the case of *Weigand* v. *Houghton*, which affirmed the decision of a chancellor to deny custody of a child (Paul) to his biological father (David) and award custody to Paul's biological mother instead solely because David was gay. 730 So. 2d 581, 583 (Miss. 1999).

49.     The underlying facts in the *Weigand* case and the contrast between the potential homes for the child Paul were extreme. Paul's father David, on the one hand, had a good job, a stable home, and did all within his power to care for Paul. *Id.* at 588. Indeed, the court observed that "David expresses a love and affection for Paul which was unquestioned . . . He has seen to Paul's needs during the period of time in which Paul has lived with him by furnishing him with not only the necessities of life, but also . . . accompanying [him] to museums, dinners, shopping and amusement parks as well as other extracurricular activities. . . . David expressed a desire for Paul to receive the highest quality education possible." *Id.* at 583–84. Paul's mother, on the other hand, "has been transitory, works two jobs, and has limited time with the child" and thus left much of Paul's care to "the unemployed stepfather [who] is a convicted felon, drinker, drug-taker, adulterer, wife-beater, and child-threatener." *Id.* at 588 (McRae, J., dissenting). But because David was gay and was then living in a committed relationship with another man, the court awarded custody to Paul's mother, despite the "psychologically and physically dangerous environment," *id.*, in which Paul would live with her and her husband. In other words, the court

16

concluded that "a homosexual lifestyle," standing alone, "ipso facto render[ed] one unfit for custody." *Id.* at 594 (Banks, J., dissenting).

50.     The next year, the Mississippi legislature, motivated by fear that a gay parent might actually succeed in obtaining custody of a child because a chancellor might conclude that it was in the best interests of the child, took action to amend Mississippi's adoption law to make it clear that as far as Mississippi was concerned, gay people were, by definition, unfit parents. As noted above, the resulting statute provides unequivocally that:  "Adoption by couples of the same gender is prohibited." Miss. Code Ann. § 93-17-3(5).

51.     In passing the Mississippi Adoption Ban, the Mississippi legislature created a single, overtly discriminatory exception to the comprehensive regulatory scheme that otherwise ensures that adoptive parents are selected in accordance with an individualized assessment of the abilities of each applicant and the best interests of each child. *See, e.g.*, Miss. Code Ann. § 93-17-11; 18-6:1 Miss. Code R. § D-V.  Indeed, Mississippi has no other categorically exempt class of persons who are unable to adopt.  Thus, while gay couples cannot adopt, convicted felons or persons who have been convicted of committing child abuse or domestic violence could theoretically be permitted to adopt under Mississippi law, or at least are not categorically exempt from filing an adoption petition in the same way that gay couples are.

52.     In taking this drastic action, the Mississippi legislature took no steps to evaluate the impact it would have on children or families in Mississippi.  There is no evidence to suggest that any studies were conducted or reviewed of gay parents or of children being raised in gay families; no testimony was taken from qualified experts in the field.  Instead, the Mississippi legislature was clear in its sole intention to express fear and moral disapproval of gay people and their families.

17

53.     State Senator Ron Farris, for example, expressed this motivation bluntly: "A homosexual relationship implies the exercise of illegal activities . . . and no child should be permitted to enter that type of setting." Gina Holland, *State Bans Adoption by Gay Couples, ACLU: Decision Likely to Bring Lawsuits*, Sun Herald, April 20, 2000, at A4. State Senator Richard White supported the Mississippi Adoption Ban for similar reasons, explaining that gay people "have already made a mistake" and "can't do the job of raising a child the right way." Gina Holland, *Parenting Hopes Put on Hold Law Says Gays Can't Adopt*, Sun Herald, July 9, 2000, at A12. State Representative Rita Martison agreed, noting that "[t]here is no way you can convince me that 'Joe has two mommies' is a value that we need to extend to the next generation." Emily Wagster, *Bill to Ban Adoptions by Same-Sex Couples Advances*, Clarion-Ledger, Feb. 23, 2000, at 5B. During debate over the measure in the Mississippi House of Representatives, State Representative Gary Chism said Mississippi could hardly have been more explicit about the "policy" behind the Mississippi Adoption Ban, explaining his belief that the State of Mississippi "shouldn't place [children] in a lifestyle that's unnatural." *Id.*

54.     The amendment to the adoption statute was signed into law by then Mississippi Governor Ronnie Musgrove. Significantly, Governor Musgrove has come to regret his support for the Mississippi Adoption Ban and has repudiated it as bad public policy. Two years ago, in a moving piece Governor Musgrove published before *Windsor* and *Obergefell* were decided, he explained that "[t]he issue of equal rights for Lesbian, Gay, Bisexual and Transgender individuals has vexed politicians for decades. I have my own cloudy history with the issue, having supported a law in Mississippi that made it illegal for LGBT couples to adopt children." Ronnie Musgrove, *Portman's Conversion Should Be a Lesson*, Huffington Post Blog, (last

18

updated May 20, 2013), http://www.huffingtonpost.com/ronnie-musgrove/portmans-conversion-shoul_b_2918493.html.

55.     Governor Musgrove's statement leaves no doubt about his impermissible motivations in signing the bill into law, confirming that the Mississippi Adoption Ban was specifically driven by fears of gay people: "As I thought about this issue, I came to understand that in order to do everything possible to keep another child from growing up like I did, we cannot continue to blindly disqualify people from becoming parents . . . simply because many of us *fear* what we do not understand.  Like a majority of Americans in recent years, I came to understand that *fear* of homosexuality was leading our governments—including the one I ran as Governor of Mississippi—to deny the equal rights to an entire segment of our population that are afforded all of us under the Constitution." *Id.* (emphasis added).

56.     But Governor Musgrove, like most other Americans, has evolved in his views and has changed his mind about the impact of Mississippi's adoption policy:  "There are far too many children in America in need of a loving home, who are shuttled between temporary homes and group shelters that fail to provide the stable, nurturing environment all children deserve. . . . And as I have gotten older, I came to understand, that a person's sexual orientation has absolutely nothing to do with their ability to be a good parent. . . . Had I vetoed the [Mississippi Adoption Ban], the Legislature had more than enough votes to override my veto.  Nonetheless, this decision that all of us made together has made it harder for an untold number of children to grow up in happy, healthy homes in Mississippi—and that breaks my heart." *Id.*

**B.     The Mississippi Adoption Ban Deprives Plaintiffs of Equal Dignity**

57.     The Mississippi Adoption Ban prohibits gay couples from adopting without any regard for their qualifications as parents or whether the adoption would be in the best interests of

the child. The only disqualifying factor is the fact that the potential adoptive parents happen to be gay. Each and every moment that Defendants deny adoption to gay couples deprives Plaintiffs of their constitutional rights and causes them and their children to suffer irreparable harm. It also harms the significant number of children in Mississippi waiting to be adopted.

58.    By barring gay couples from adopting, Mississippi's adoption law demeans gay families and deprives them of equal dignity. As the Supreme Court recently explained in *Obergefell* v. *Hodges*, "[t]here is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices." 135 S. Ct. 2584, 2599 (2015). Among those "profound choices" is the choice to have children, which the State has traditionally provided to committed couples, particularly those who are married. *Id.* at 2600.

59.    By singling out gay couples for denial of adoption rights, Mississippi relegates them to second-class status. *Cf. Windsor*, 133 S. Ct. at 2693 ("The avowed purpose and practical effect of the [Defense of Marriage Act] are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages.").

60.    The irrational prejudice behind Mississippi's blanket disqualification of gay couples from adoption is perhaps best demonstrated by the simple fact that gay couples are relegated to the second-class status created for them by the Mississippi Adoption Ban. No other category or group is singled out for a blanket adoption ban, not even people with characteristics that—unlike being gay—are clearly rationally related to one's potential qualifications as an adoptive parent under the *Albright* factors.

61.    Mississippi's adoption law also demeans children who are actually being raised by two gay married parents in Mississippi, but who have only one legal parent. In the words of Justice Kennedy, the inability for the other parent to legally adopt under Mississippi's laws

"makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor*, 133 S. Ct. at 2694.

62.     In these ways and more, Mississippi's law has caused Defendants and other state officials to deny Plaintiffs the rights, benefits, and duties that come with adoption.  Child rearing plays a unique role in American society, with significant social, economic, and legal implications.  In recognition of the deep and abiding commitment that married couples make to their children, our legal system provides benefits and duties to legally recognized parents that are not otherwise available.  These include numerous protections involving all aspects of daily life. *See generally, e.g.*, Miss. Code Ann. tit. 37 (Education); Miss. Code Ann. tit. 41 (Public Health); Miss. Code Ann. tit. 43 (Public Welfare); Miss. Code Ann. tit. 91 (Trusts and Estates); Miss. Code Ann. tit. 99 (Criminal Procedure).  It is hard to imagine a regime more at odds with creating and maintaining stable relationships within which children may flourish.

63.     The absence of a legal relationship between parent and child often becomes critical in situations that are already stressful or traumatic for families, including medical emergencies and the death of a parent.  As Judge Daughtrey explained in her dissent in *DeBoer* v. *Snyder* in the United States Court of Appeals for the Sixth Circuit, "should anything happen to that adoptive parent, there is no provision in Michigan's legal framework that would 'ensure that the children would necessarily remain with the surviving non-legal parent.'"  772 F.3d 388, 425 (6th Cir. 2014) (Daughtrey, J., dissenting), *rev'd sub nom. Obergefell* v. *Hodges*, 135 S. Ct. 2584 (2015).

64.     The same is true for Plaintiffs here.  Kathy and Susan have lived in fear, especially in the first few years after H.M.G. was born, that Susan could lose H.M.G. if

something were to happen to Kathy.  Donna and Jan understandably share similar concerns and anxiety, which they feel particularly acutely when Donna is deployed away from home.  During deployments, Jan and H.M.S.P. worry not only for Donna's safety, as does the family of every service member on duty away from home, but they also have the added distress that, if something were to happen to Donna, they could lose each other as well.

65.     Mississippi's Adoption Ban conveys the message that gay families are inherently less valuable than all other families and should not be afforded the same dignity under the law. It is a public, government-sponsored rejection of one of the most important relationships in the lives of gay Mississippians, and it unconstitutionally relegates them and their families to second-class citizenship.

**C.     The Mississippi Adoption Ban Contradicts Sound Public Policy Encouraging Adoption**

66.     Mississippi's discriminatory adoption law also irreparably harms children in need of adoptive parents.

67.     MDHS has approximately 400 children in protective custody who are waiting to be adopted.  Approximately 100 of those children are currently in foster care and have not yet been matched with adoptive parents. *Mississippi Heart Gallery: Overview*, 200 Million Flowers, Inc., http://www.200millionflowers.org/adoption/dhs-kids (last visited Aug. 4, 2015).  Profiles of children in the Department of Human Services' care in Mississippi who are waiting to be adopted, such as Aeron, "a sweet, out-going 8-year old boy" who "loves eating soul food" or Joyce, a 17-year-old 10th grader, who is a "good student" and "likes to climb trees," are available at: http://www.200millionflowers.org/adoption/dhs-kids/available-kids.

68.     Many of the children who have not been adopted have serious medical, emotional, or psychological needs.  These needs stem from backgrounds of adversity, loss, and instability,

such as parental abuse and neglect, removal from their homes, and subsequent (sometimes multiple) temporary placements. Many of these children like Joyce are older, which makes them still less likely to be adopted. Whatever the reason, there is a backlog of children waiting for permanent, safe, and loving families, and it is well documented that when these children are adopted and become part of a permanent family, their prospects for a happy, healthy, and productive future are greatly enhanced.

69.     Mississippi's legislature and MDHS have enacted a comprehensive regulatory scheme to ensure that adoptive parents are selected in accordance with an individualized assessment of the abilities of each applicant and the best interests of the child. *See, e.g.*, Miss. Code Ann. § 93-17-11; 18-6:1 Miss. Code R § D-V. There can be no question that Mississippi otherwise strongly encourages parents to adopt. *See* 18-6:1 Miss. Code R § G-1.II (explaining that "[t]he primary purpose of the DFCS's Adoption Program is to foster permanent connections for children," and that the general functions of MDHS include "[s]erving as a consultant to agencies providing adoption services," recommending legislation that further protects children and adoptive parents, and informing the public of adoption practices from a legal perspective).

70.     Prohibiting gay and lesbian married couples from adopting—couples that tend to be more motivated to adopt—means that many of the children waiting to be adopted will have to wait longer, and some will age out of foster care without ever having a permanent, stable family of their own.

71.     Furthermore, Mississippi incurs significant costs running the foster care system, costs that are directly tied to the number of children in the system waiting to be adopted. The Williams Institute has estimated that if no gay and lesbian person were allowed to adopt, it could add $87 million to $130 million in foster care system expenditures each year. Gary J. Gates, et

al., *Adoption and Foster Care by Gay and Lesbian Parents in the United States*, The Williams
Institute at 19 (Mar. 2007), http://www.urban.org/research/publication/adoption-and-foster-care-
lesbian-and-gay-parents-united-states/view/full_report. Preventing qualified gay parents from
adopting leaves more children in foster care for longer periods of time and this, in turn, costs the
state more money.

72.     In the *Campaign for Southern Equality* case, Judge Reeves noted the irony of
preventing gay couples who want to provide loving, stable households from adopting, observing
that: "Like many states, Mississippi suffers when heterosexual parents have unprotected sex,
bear children, and cannot take care of them. A number of those children end up in the foster care
system, the juvenile justice system, and the children's mental health system. These children
need homes and caretakers that love them. Same-sex couples can help. As one Mississippi mom
explained, 'Children are precious to gay people because they are so hard to come by. We have to
plan for them; they don't come unexpectedly. And we are blessed to have them, we love them
dearly.'" *Campaign for S. Equal.* v. *Bryant*, 64 F. Supp. 3d 906, 943–44 (S.D. Miss. 2014)
(quoting Charlotte Graham, *Religion and Same–Sex Marriages,* The Clarion–Ledger, Sept. 14,
1996), *aff'd,* No. 14-60837, 2015 WL 4032186 (5th Cir. July 1, 2015).

73.     The Mississippi Adoption Ban deprives some of the most vulnerable children in
foster care in Mississippi from finding stable, loving families. Children likely to wait in
temporary care longer, such as children who are LGBT themselves, are disadvantaged by
restrictions on adoption and fostering by gay married couples. Research demonstrates that gay
and lesbian couples have an understanding of how it feels to be different and may have overcome
oppression and discrimination in their own lives. U.S. Dep't of Health & Human Servs.,
*Administration for Children and Families, Working with Lesbian, Gay, Bisexual, and*

*Transgender (LGBT) Families in Adoption* at 5 (Jan. 2011), https://www.childwelfare.gov/pub PDFs/f_profbulletin.pdf.

74.     Gay and lesbian couples, like Plaintiffs Tina and Kari, may also be more willing than opposite-sex couples to adopt children viewed as different—including special needs children, "who are among the most difficult to place," and LGBT youth.  Placements with gay and lesbian couples also can be beneficial for some LGBT young people, as gay parents can draw on personal experience to connect with and assist LGBT youth, who are over-represented in, and chronically underserved by, the foster care system.  *See generally* Colleen Sullivan et al., *Youth in the Margins: A Report on the Unmet Needs of Lesbian, Gay, Bisexual, and Transgender Adolescents in Foster Care*, (2001), http://www.jimcaseyyouth.org/sites/default/files/documents /youthinthemargins_2001.pdf.  Many more gay couples in Mississippi would like to provide such homes for children through adoption.

75.     In addition, many gay people raising children are members of racial or ethnic minorities.  Specifically, one in three people in lesbian relationships who are members of racial or ethnic minorities (35%) are raising a child under age 18, compared to 24% for their white counterparts.  Gary J. Gates, *Demographics of Married and Unmarried Same-sex Couples: Analyses of the 2013 American Community Survey*, The Williams Institute (Mar. 2015), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Demographics-Same-Sex-Couples-ACS2013-March-2015.pdf.  For gay men, the same comparison is 16% versus 6%, respectively. *Id.* These facts are not insignificant because, in 2013, the majority of children in foster care in Mississippi were non-white (54.8%).  Children's Bureau of the Dep't of Health & Human Servs., *Race/Ethnicity of Children in Foster Care (%)*, http://cwoutcomes.acf.hhs.gov/data/tables/foster_ race_incareoctoberones?states[]=25&state=&region=.

**D.      The Mississippi Adoption Ban Harms the Children of Gay Parents**

76.      Gay couples, many of whom are now married, provide safe, loving, and nurturing homes to children all across the country, including in Mississippi.  By denying these households in Mississippi the ability to adopt, the State does not encourage the stability or well-being of the family or community in which they live, it only undermines it.

77.      As noted in paragraphs 15 and 24 above, Kathy and Susan's son H.M.G. and Donna and Jan's daughter H.M.S.P. are thriving by any measure.  But that is a testament to Kathy and Susan's and Donna and Jan's extraordinary ability to raise healthy, well-adjusted children despite the impediments placed on their ability to do so by the discriminatory Mississippi Adoption Ban.  In other words, Kathy and Susan and Donna and Jan have had to work overtime to ensure that their children understand—despite the State's contrary message— that their family is as good as everyone else's.

78.      Will Miller, a 28-year-old Mississippian whose mothers have been together for 23 years, has explained that he never "underst[ood] what all the fuss was about:"  "They loved me, and that was all that mattered.  It's all that should matter.  Indeed, my childhood as the son of lesbian parents was extraordinary in that it was simply ordinary."  Statement of Will Miller to Family Equality Council (Jul. 3, 2014), Brief for Family Equality Council et al. as Amici Curiae in Support of Petitioners at 12, Obergefell v. Hodges, 135 S. Ct. 2584, 2601 (2015) (No. 14-556).

79.      The positive experiences that children of gay parents have are consistent with decades of social science findings:  children of same-sex parents and children of different-sex parents fare equally well academically, psychologically, and socially.  All of the leading social service organizations agree that gay and lesbian parents do just as well as straight parents at

raising happy, healthy, and well-adjusted children. There is no serious or legitimate dispute on

this issue among social scientists and mental health professionals.

80.    As the district court for the Southern District of Mississippi observed in the

*Campaign for Southern Equality* case:

> A final stereotype was that gay and lesbian citizens were unfit parents who would
> harm children. The Executive Director of the American Family Association, a
> family values group in Tupelo, argued that children raised in same-sex households
> have "problems in relationships with members of the opposite sex," are 29 times
> more likely to be the victim of incest, suffer a variety of psychological problems,
> and are at "greater risk of becoming homosexual" themselves. Mike Crook,
> *Should Gay Adoption Be Banned? "Yes"*, The Clarion–Ledger, Mar. 26, 2000.

> Proponents of the above notions have had the opportunity to prove these theories
> in court, but failed. Two of the trials in which these proponents' theories were
> debunked are summarized here.

> The champions of California's same-sex marriage ban promised to show 23
> "specific harmful consequences" that families, children, and society would suffer
> if same-sex marriage was allowed to recommence in that state. *Perry* v.
> *Schwarzenegger*, 704 F. Supp. 2d 921, 931 (N.D. Cal. 2010). At trial, however,
> they "provided no credible evidence to support any of the claimed adverse effects
> proponents promised to demonstrate." *Id.* The expert testimony that was
> presented showed that "gays and lesbians are no more likely than heterosexuals to
> pose a threat to children"; "children raised by gay or lesbian parents are just as
> likely to be well-adjusted as children raised by heterosexual parents"; "same-sex
> couples are in fact indistinguishable from opposite-sex couples in terms of
> relationship quality and stability"; and adoptive parents "actually on some
> outcomes outstrip biological parents in terms of providing protective care for their
> children." *Id.* at 935. The court concluded that "children of same-sex couples
> benefit when their parents can marry." *Id.* at 973.

> The State of Michigan also had an opportunity to prove, at trial, the harms that
> would develop from same-sex marriage. *See DeBoer* v. *Snyder*, 973 F. Supp. 2d
> 757, 761–68 (E.D. Mich. 2014). Its main expert witness presented testimony that
> was "entirely unbelievable and not worthy of serious consideration." *Id.* at 766.
> The state's other experts were no better: the court concluded that they all "clearly
> represent a fringe viewpoint that is rejected by the vast majority of their
> colleagues across a variety of social science fields." *Id.* at 768. As to the alleged
> harm to children presented by homosexuals, the court noted that the American
> Medical Association, American Academy of Pediatrics, American Psychological
> Association, and other professional organizations concerned for the welfare of
> children have expressed "support for parenting, adoption, and/or fostering by
> lesbian and gay couples." *Id.* at 763.

64 F. Supp. 3d at 938–39 (Reeves, J.).

81.     Significantly, in the Mississippi marriage case neither Governor Bryant nor Attorney General Hood argued, either before Judge Reeves or at the Fifth Circuit, that gay couples should not be permitted to marry because they are unfit parents or even worse as compared to straight parents. *See* Brief of Governor Phil Bryant and Attorney General Jim Hood in Opposition to Plaintiffs' Motion for Preliminary Injunction, Campaign for S. Equal. v. Bryant, 64 F. Supp. 3d 906 (S.D. Miss. 2014) (No. 3:14-cv-818); Transcript of Oral Argument, Campaign for S. Equal. v. Bryant, 64 F. Supp. 3d 906 (S.D. Miss. 2014) (No. 3:14-cv-818); Brief of Phil Bryant and Jim Hood as Appellants, Campaign for S. Equal. v. Bryant, 2015 WL 4032186 (5th Cir. July 1, 2015) (No. 14-60837); Reply Brief of Phil Bryant and Jim Hood as Appellants, Campaign for S. Equal. v. Bryant, 2015 WL 4032186 (5th Cir. July 1, 2015) (No. 14-60837).

82.     In fact, more than 100 studies of youths raised by gay and lesbian parents conducted over the past 25 years by respected researchers and published in peer-reviewed academic journals have concluded that children and adolescents raised by gay parents are as successful psychologically, emotionally, and socially as children and adolescents raised by straight parents. *See* Expert Affidavit of Michael Lamb, Ph.D., Ex. B at 2–8, *Windsor* v. *United States*, 833 F. Supp. 2d 394 (S.D.N.Y. 2011) (No. 10 Civ. 8435) (listing studies). As Professor Lamb has explained: "[T]he research on gay parent families is a robust body of research that meets rigorous methodological standards demanded for publication in the leading academic journals. There is simply no basis on which to dismiss this body of research as invalid or unreliable due to methodological deficiencies." Supplemental Expert Affidavit of Michael

Lamb, Ph.D. at 6–7, *Windsor* v. *United States*, 833 F. Supp. 2d 394 (S.D.N.Y. 2011) (No. 10 Civ. 8435).

83.     The American Psychological Association, for example, has stated that: "Assertions that heterosexual couples are better parents than same-sex couples, or that the children of lesbian or gay parents fare worse than children of heterosexual parents, are not supported by the cumulative scientific evidence.  Rather, the vast majority of scientific studies that have directly compared these groups have found that gay and lesbian parents are as fit and capable as heterosexual parents, and that their children are as psychologically healthy and well adjusted.  More research has focused on lesbian mothers than on gay fathers, but published studies of gay fathers find that they are as fit and able parents as heterosexual fathers."  Brief for the American Psychological Association et al. as Amici Curiae in Support of Petitioners at 22–23, Obergefell v. Hodges, 135 S. Ct. 2584, 2601 (2015) (No. 14-556).  Indeed, "the parenting abilities of gay men and lesbians—and the positive outcomes for their children—are *not* areas where credible scientific researchers disagree." *Id.* at 26.

84.     Similarly, the American Academy of Pediatrics has concluded that:  "There is extensive research documenting that there is no causal relationship between parents' sexual orientation and children's emotional, psychosocial, and behavioral development.  Many studies attest to the normal development of children of same-gender couples when the child is wanted, the parents have a commitment to shared parenting, and the parents have strong social and economic supports."  Am. Acad. of Pediatrics, *Policy Statement, Promoting the Well-Being of Children Whose Parents are Gay or Lesbian*, 131 Pediatrics 827, 828 (Apr. 2013).  The American Medical Association has likewise adopted a policy supporting legislative and other reforms to allow adoption by gay and lesbian couples.  Am. Med. Ass'n, Policy H-60.940,

*Partner Co-Adoption*, http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory-committee/ama-policy-regarding-sexual-orientation.page?.

85.     The National Association of Social Workers has also determined that "[t]he most striking feature of the research on lesbian mothers, gay fathers, and their children is the absence of pathological findings.  The second most striking feature is how similar the groups of gay and lesbian parents and their children are to heterosexual parents and their children that were included in the studies."  Nat'l Ass'n of Soc. Workers, *Nat'l Ass'n of Soc. Workers, Policy Statement: Lesbian, Gay, and Bisexual Issues, in* Social Work Speaks 193, 194 (1997).

86.     By preventing children from being adopted by otherwise qualified married gay couples, the Mississippi Adoption Ban does not improve or in any way affect the stability of families with opposite-sex parents, and instead circumvents the regulatory system that otherwise ensures that adoptions proceed in the best interests of the child.

### CAUSES OF ACTION

### CLAIM ONE: EQUAL PROTECTION

87.     Plaintiffs incorporate by reference paragraphs 1 through 86, *supra*, as if set forth fully herein.

88.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

89.     The Mississippi Adoption Ban at issue denies to persons within Mississippi the equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States.  By allowing straight couples to adopt, while refusing to allow gay couples to do the same, the State of Mississippi impermissibly distinguishes among similarly situated people by discriminating solely on the basis of sexual orientation.  By refusing to permit adoption by

gay couples, the State of Mississippi deprives those couples of all the adoption-related rights and duties that Mississippi offers straight couples, rendering them unequal before the law and denying their relationships the dignity to which they are constitutionally entitled.

90. Notably, the Supreme Court in *Obergefell* recognized the close connection between the right for gay couples to marry and for gay couples to adopt. *See Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2601 (2015) ("[W]hile the States are in general free to vary the benefits they confer on all married couples, they have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities. These aspects of marital status include . . . adoption rights . . .").

91. The Equal Protection Clause "direct[s] that all persons similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, "even when the group discriminated against is not a 'suspect class,' courts examine, and sometimes reject, the rationale offered by government for the challenged discrimination." *Baskin* v. *Bogan*, 766 F.3d 648, 654 (7th Cir. 2014). A law cannot be sustained where the proffered reasons for the law are simply irrational. Further, classifications that are "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective" are subject to especially searching judicial review. *Plyler* v. *Doe*, 457 U.S. 202, 216 n.14 (1982). The Mississippi Adoption Ban fails to satisfy the guarantees of the Equal Protection Clause under any level of judicial review.

92. It is now well-accepted that a law cannot withstand even rationality review where the "purpose" of the classification is "disadvantaging the group burdened by the law." *Romer* v. *Evans*, 517 U.S. 620, 633 (1996). The Supreme Court has thus made clear that a law fails rational basis review if it was passed through "animosity," or the "bare . . . desire to harm a

politically unpopular group." *Id.* at 634. Moreover, as Justice Kennedy has explained, "animus" does not necessarily require overt hatred or hostility, but may instead reflect merely an "insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Bd. of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).

93.     Animus, as that term has been construed in cases like *Garrett* and *Lawrence* v. *Texas*, 539 U.S. 558 (2003), is the sole basis for the discrimination borne by gay couples in Mississippi. There is no legitimate governmental interest furthered by the statutory provision presently at issue, which serves only to deny gay couples the right to adopt. By relegating gay couples and their families to a disfavored legal status, Mississippi impermissibly creates a second-class caste among its citizens, in violation of the Fourteenth Amendment's guarantee of equal protection of the laws.

94.     The Supreme Court in *Windsor* and *Obergefell* applied some form of heightened scrutiny to review and strike down laws that discriminated against gay people by not allowing them to marry and not recognizing their lawful marriages performed elsewhere. *See Windsor*, 133 S. Ct. at 2696–97; *Obergefell*, 135 S. Ct. at 2608; *see also SmithKline Beecham Corp.* v. *Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014); *Windsor*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013).

95.     When determining whether to apply heightened scrutiny to laws that discriminate against a particular group of people, courts consider the following factors: (1) whether the group has suffered a history of discrimination; (2) whether the group members differ from other individuals in a way that bears on their ability to perform or contribute to society; (3) whether the group is defined by "obvious, immutable or distinguishing characteristics"; and (4) whether the

group lacks political power because prejudice against the group tends seriously to curtail the operation of those political processes ordinarily to be relied upon. *Windsor*, 699 F.3d at 181–82. Each of these four factors militates strongly in favor of applying heightened scrutiny here. Indeed, a federal district court in Mississippi evaluating whether heightened scrutiny should apply to discrimination against gay people recently concluded that "[i]ntermediate scrutiny is most appropriate." *Campaign for S. Equal.*, 64 F. Supp. 3d at 941 (though ultimately concluding that circuit precedent foreclosed the court from applying that appropriate form of scrutiny).

96.     Gay people have endured a long and painful history of popular and state-sponsored discrimination within the United States, including within Mississippi. *See Obergefell*, 135 S. Ct. at 2596–97; *Windsor*, 133 S. Ct. at 2693–95; *Campaign for S. Equal*, 64 F. Supp. 3d at 930–37.

97.     This discrimination is based solely on their sexual orientation.   It bears no relationship to their ability to contribute to society at large. *See Obergefell*, 135 S. Ct. at 2596; *Windsor*, 133 S. Ct. at 2694–95; *Campaign for S. Equal.*, 64 F. Supp. 3d at 937.

98.     Sexual orientation is an innate and immutable trait of all people. *See Obergefell*, 135 S. Ct. at 2594, 2596; *Campaign for S. Equal.*, 64 F. Supp. 3d at 939.

99.     Gay people lack the political power to protect themselves through the democratic process by overturning discriminatory laws and passing laws that would protect their rights. *See Windsor*, 133 S. Ct. at 2693; *Campaign for S. Equal.*, 64 F. Supp. 3d at 940, 945, 948.

100.    The Mississippi Adoption Ban also violates the Fourteenth Amendment's Equal Protection Clause because it discriminates on the basis of sex. As Judge Berzon explained in her concurrence in the Ninth Circuit's decision in *Latta* v. *Otter*: "[I]t can make no difference to the existence of a sex-based classification whether the challenged law imposes gender

33

homogeneity . . . or gender heterogeneity.  Either way, the *classification* is one that limits the affected individuals' opportunities based on their sex, as compared to the sex of the other people involved in the arrangement or transaction."  771 F.3d 456, 481 (9th Cir. 2014) (Berzon, J., concurring).  The distinction Mississippi draws between straight and gay married couples with respect to parenting is implicitly based on an individual's gender.  *See id.* at 484 ("Laws that strip *individuals* of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory and must be subjected to intermediate scrutiny." (citing *J.E.B.* v. *Alabama*, 511 U.S. 127, 140–42 (1994))).

## CLAIM TWO: DUE PROCESS

101.    Plaintiffs incorporate by reference paragraphs 1 through 100, *supra*, as if set forth fully herein.

102.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.  The provision of the Mississippi Code presently at issue, § 93-17-3(5), deprives gay couples of the liberties guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  The Mississippi Adoption Ban impinges on the fundamental liberty interest of gay couples to parent their children and denies them an essential component of their marriages.

103.    As the Supreme Court proclaimed in *Obergefell*, "[u]nder the Due Process Clause of the Fourteenth Amendment, no State shall 'deprive any person of life, liberty, or property, without due process of law.' . . .  [T]hese liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." 135 S. Ct. at 2597.  The Court further held that when "same-sex couples are denied all the benefits afforded to opposite-sex couples [they] are barred from exercising a fundamental

right." *Id.* at 2604. Additionally, the Court reaffirmed the longstanding constitutional principle that "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections." *Id.* at 2606 (quoting *W. V. Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 638 (1943) (internal quotation marks omitted)).

104.    The freedom to have and raise children is one of the most basic civil rights. The deprivation of this right constitutes a denial of due process of law in violation of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Cleveland Bd. of Educ.* v. *LaFleur*, 414 U.S. 632, 639–40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."). As is the case with heightened scrutiny under the Equal Protection Clause for a suspect class, "interference with a fundamental right warrants the application of strict scrutiny." *Bostic* v. *Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014).

105.    "[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause." *Obergefell*, 135 S. Ct. at 2600 (quoting *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978)). "Many same-sex couples provide loving and nurturing homes to their children, whether biological or adopted." *Id.* "Most States have allowed gays and lesbians to adopt, either as individuals or as couples, and many adopted and foster children have same-sex parents." *Id.* "This provides powerful confirmation from the law itself that gays and lesbians can create loving, supportive families." *Id.*

106.    By denying gay couples the right to be parents and "bring up children," Defendants stigmatize gay couples, their children, and their families by depriving them of the dignity and stature afforded to straight, married couples through governmental recognition of one of their most cherished relationships. Gay couples are denied the ability "to understand the

integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.* (quoting *Windsor*, 133 S. Ct. at 2694–95). "[T]heir children suffer the stigma of knowing their families are somehow lesser." *Id.*

107.    Defendants' enforcement of § 93-17-3(5) also harms children in Mississippi by categorically denying those in the foster care system the possibility of having adoptive parents and denying children being raised by gay and lesbian couples the possibility of having two legal parents. The State has a duty to act in the best interests of—and certainly not to harm—children in its custody.

## DECLARATORY AND INJUNCTIVE RELIEF

### 28 U.S.C. §§ 2201 and 2202; Federal Rules of Civil Procedure 57 and 65

108.    Plaintiffs incorporate by reference paragraphs 1 through 107, *supra*, as if set forth fully herein.

109.    This case presents an actual controversy because Defendants' present and ongoing denial of equal protection and due process to Plaintiffs subjects them to serious and immediate harms, warranting the issuance of a declaratory judgment.

110.    Plaintiffs seek an injunction to protect their constitutional rights and avoid the injuries described in this complaint. A favorable decision enjoining Defendants would redress and prevent the irreparable injuries to Plaintiffs identified herein, for which Plaintiffs have no adequate remedy at law.

111.    The State of Mississippi will incur no or little burden in allowing gay couples to adopt and in recognizing valid adoption of children by gay couples, whereas the hardship for Plaintiffs of being denied equal treatment and the denial of a fundamental right is severe. The balance of hardships weighs strongly in favor of Plaintiffs.

36

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter an order:

1.      Declaring that Miss. Code Ann. § 93-17-3(5), as applied to Plaintiffs and on its face, violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

2.      Preliminarily and permanently enjoining the enforcement and application of Miss. Code Ann. § 93-17-3(5);

3.      Awarding Plaintiffs their reasonable costs, expenses, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.      Granting such other relief as the Court may deem just, equitable, and proper.

37

Respectfully submitted,

Dated:  August 12, 2015

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

    Roberta A. Kaplan*
      *Lead Counsel*
    Andrew J. Ehrlich*
    Joshua D. Kaye*
    Jacob H. Hupart*
    Alexia D. Koritz*
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:(212) 373-3000
Fax:(212) 757-3990
rkaplan@paulweiss.com
aehrlich@paulweiss.com
jkaye@paulweiss.com
jhupart@paulweiss.com
akoritz@paulweiss.com

**BRAZIL & BURKE, P.A.**

    Meghann K. Burke*
77 Central Avenue, Suite E
Asheville, NC 28801
Tel: (828) 255-5400
Fax: (828) 258-8972
meghann@brazilburkelaw.com

*Pro hac vice application forthcoming

*Attorneys for Plaintiffs Campaign for Southern
Equality, Family Equality Council, Donna
Phillips, Janet Smith, Kathryn Garner, Susan
Hrostowski, Jessica Harbuck, Brittany Rowell,
Tinora Sweeten-Lunsford, and Kari Lunsford.*

MCDUFF & BYRD



By:
    Robert B. McDuff
      Bar No. 2532
    Sibyl C. Byrd
      Bar No. 100601
    Jacob W. Howard
      Bar No. 103256
767 North Congress Street
Jackson, Mississippi 39202
Tel:(601) 969-0802
Fax: (601) 969-0804
rbm@mcdufflaw.com
scb@mcdufflaw.com
jake@mcdufflaw.com

**ELLIS LAW FIRM, PLLC.**

    Dianne Herman Ellis
      Bar No. 102893
1145 Robinson Avenue,
Ocean Springs, MS 39564
Tel: (228) 215-0037
Fax: (228) 284-1889
diannernjd@aol.com

38