UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CAMPAIGN FOR SOUTHERN
EQUALITY, et al.

                                                                PLAINTIFFS

v.                                          CIVIL ACTION NO. 3:15cv578-DPJ-FKB

MISSISSIPPI DEPARTMENT OF HUMAN                          DEFENDANTS
SERVICES, et al.

ORDER

Plaintiffs seek a declaration that Mississippi Code section 93-17-3(5)—which prohibits adoption by married gay couples—violates the Due Process and Equal Protection Clauses of the United States Constitution.  They named as defendants the Mississippi Department of Human Services ("DHS"), DHS's Executive Director, three chancery courts, nine chancellors from those three courts, and Mississippi's Governor and Attorney General.

Defendants have offered a tepid defense of the statute itself, focusing instead on Plaintiffs' right to sue them.  They argue that even assuming section 93-17-3(5) is unconstitutional, Plaintiffs lack Article III standing and cannot overcome Eleventh Amendment immunity.  The Governor, Attorney General, and Executive Director further contend that there is no injury because those Defendants either lack authority to enforce the ban or would not enforce it to impede an otherwise valid gay adoption.  For the reasons that follow, the Court finds that Plaintiffs have standing as to DHS's Executive Director but no other defendant.  And finding a justiciable claim, Plaintiffs' motion for preliminary injunction is granted.

I.      Background and Procedural History

Mississippi Code section 93-17-3(5) states simply:  "Adoption by couples of the same gender is prohibited."  Four lesbian couples residing in Mississippi and two advocacy groups

now challenge that statute under the Due Process and Equal Protection Clauses of the United States Constitution.  Two of the couples seek a private adoption involving the biological child of one of the partners.  The others desire adoption through Mississippi's foster-care system.

After Plaintiffs initiated this suit, the parties filed the following motions that are now before the Court:  (1) the Motion for Preliminary Injunction [13] filed by four of the individual plaintiffs; (2) the Motion to Dismiss for Lack of Subject Matter Jurisdiction [15] filed by Defendants DHS; John Davis, its Executive Director[1]; Governor Phil Bryant; and Attorney General Jim Hood ("the "Executive-Branch Defendants"); (3) the Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim [52] filed by Defendants the Tenth, Fourteenth, and Twentieth District Chancery Courts and Judges Dawn Beam, M. Ronald Doleac, Deborah J. Gambrell, Johnny L. Williams, Kenneth M. Burns, Dorothy W. Colom, Jim Davidson, John Grant, and John C. McLaurin, Jr. (the "Judicial Defendants"); and (4) the Executive-Branch Defendants' Motion to Dismiss the Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction [55].

The Court conducted an evidentiary hearing on these motions on November 6, 2015.  The issues are ripe for decision, and the Court is prepared to rule.  This Order will first address Defendants' various motions to dismiss before turning to the motion for preliminary injunction.

II.     Motions to Dismiss

All Defendants seek dismissal under Rule 12(b)(1) of the Federal Rules of Civil

---

[1]According to the Notice of Substitution Pursuant to F.R.C.P. 25(d) [66] filed February 1, 2016, Richard Berry, the former Executive Director of DHS who was initially named as a defendant in this case, retired effective January 31, 2016.  Under Rule 25(d), Davis was automatically substituted as a defendant for Berry.

Procedure and have submitted record evidence to support their motions.

> In determining whether the court has subject matter jurisdiction, we must accept as true the allegations set forth in the complaint. The court is also empowered to consider matters of fact which may be in dispute. Therefore, a trial court has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. The party invoking federal jurisdiction bears the burden of establishing standing.

*Crane v. Johnson*, 783 F.3d 244, 250–51 (5th Cir. 2015) (citation and internal quotation marks omitted). During the hearing, the parties agreed that this standard applies. Accordingly, the Court has considered the First Amended Complaint, the parties' record evidence, and the testimony presented during the hearing.

A. DHS and the Chancery Courts

Plaintiffs conceded that DHS and the chancery courts are entitled to Eleventh Amendment immunity. Accordingly, those parties are dismissed without prejudice to refiling in state court.

B. Article III Standing

The Executive-Branch and Judicial Defendants contend that Plaintiffs lack standing to bring suit in federal court. While Plaintiffs attempt to marginalize this argument as a mere technicality, standing is a threshold matter to the justiciability of claims in federal court under Article III of the Constitution. Indeed, it is a "basic proposition that the Constitution limits our jurisdiction to 'Cases' and 'Controversies.'" *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (citing U.S. Const. art. III, § 2). Significantly,

> [t]he judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or

3

> executive acts.  The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution.  Rather, federal courts sit "solely, to decide on the rights of individuals," *Marbury v. Madison*, 1 Cranch 137, 170, 2 L. Ed. 60 (1803), and must "'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.'"

*Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (some citations and internal quotation marks omitted).

"At bottom, 'the gist of the question of standing' is whether the parties invoking standing have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Mass. v. Envtl. Prot. Agency*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  Standing is not, therefore, a mere technicality, and its applicability differs in this case with respect to the various Plaintiffs and the officials against whom they bring this suit.  *See Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) ("The court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'") (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

1.     The Judges

Plaintiffs did not initially sue the Judicial Defendants.  But when the Executive-Branch Defendants argued that only judges are empowered to apply section 93-17-3(5), Plaintiffs amended their complaint to assert claims against them.  The problem is that the judges are not the Plaintiffs' adversaries.

*Bauer v. Texas* is directly on point.  341 F.3d 352 (5th Cir. 2003).  In that case, a woman who had been involuntarily subjected to guardianships challenged the constitutionality of the

Texas laws creating them, naming as a defendant the judge who had previously placed her in one. The Fifth Circuit noted that the "case or controversy requirement of Article III of the Constitution requires a plaintiff to show that he and the defendants have adverse legal interests." *Id.* at 359. And when a judge acts in his or her adjudicatory capacity—as opposed to administrative capacity—no such adversity exists. *Id.* Thus, "[o]rdinarily, no case or controversy exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* at 361 (citing *In re Justices of The Supreme Ct. of P.R.*, 695 F.2d 17, 19 (1st Cir. 1982)).

In their briefs, Plaintiffs assert that judges in Mississippi deciding adoption petitions are not acting in an adjudicatory capacity, but that argument is not persuasive and was essentially abandoned during argument.[2] A petition for adoption initiates a pending case that is brought in chancery court and falls within the chancellor's statutorily defined judicial functions. Even with respect to section 93-17-3(5), state-court judges possess the power of judicial review. The Court concludes that the chancellors act in an adjudicative capacity when hearing adoption petitions.

Finally, Plaintiffs offered an alternative argument that the judges should remain in the case as nominal parties to aid in enforcement of any relief they may obtain. There is some non-

---

[2]In the immunity context, courts should consider four factors when determining whether a judge acts in his or her adjudicatory capacity:

> (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity.

*Ballard v. Wall*, 413 F.3d 510, 515 (5th Cir. 2005) (quoting *Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993)).

binding support for such steps when no other party is properly before the court. *See generally In re Justices of Supreme Ct. of P.R.*, 695 F.2d at 22 (discussing issue while finding plaintiffs lacked standing). But even assuming the argument has merit, which is not apparent, this is not such a case. The claims against the judges are dismissed with prejudice.

2.     Executive-Branch Defendants

To establish standing with respect to the Executive-Branch Defendants, Plaintiffs must demonstrate three elements: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

a.     Injury in Fact

Defendants initially challenged this prong, but they elected to emphasize the remaining prongs in their reply and again during argument. Defendants were correct to take that approach given the tests that apply to statutes—like this one—that impose a barrier for some individuals but not others.

"In *Lujan*, the Court explained a key question is 'whether the plaintiff is himself an object of the government action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517–18 (5th Cir. 2014) (quoting *Lujan*, 504 U.S. at 561–62). As the United States Supreme Court later explained in *Northeastern Florida Chapter of Associated General Contractors of*

*America v. City of Jacksonville, Florida*,

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. 656, 666 (1993); *see also id.* ("To establish standing, therefore, a party challenging a

set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on

contracts and that a discriminatory policy prevents it from doing so on an equal basis.").

The Fifth Circuit has faithfully applied this rule.  Just last year, the court held in

*Contender Farms, L.L.P.*, that "[i]f a plaintiff is an object of a regulation 'there is ordinarily little

question that the action or inaction has caused him injury.'"  779 F.3d at 264 (quoting *Lujan*, 504

U.S. at 561–62).  The same result occurred in *Time Warner Cable, Inc. v. Hudson*, where a

newly enacted state law "single[d] out certain incumbent [cable] operators as ineligible for the

benefit of a statewide franchise" made available to their competitors.  667 F.3d 630, 636 (5th

Cir. 2012).  The court found an injury in fact, noting that "[w]hen the government targets certain

speakers for the exclusion of benefits bestowed on similar parties, 'no further showing of

suffering based on that unequal positioning is required for purposes of standing.'"  *Id.* (quoting

*Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 218 (5th Cir. 2008)); *see also*

*Duarte*, 759 F.3d at 515 (finding injury where law made it "differentially more burdensome for"

its object to exercise privileges enjoyed by others).

"Whether someone is in fact an object of a regulation is a flexible inquiry rooted in

common sense."  *Contender Farms, L.L.P.*, 779 F.3d at 265.  Here, section 93-17-3(5) obviously

targets married gay couples and limits their rights.  And as discussed below, individual Plaintiffs have taken steps sufficient to show they desire adoption.  Plaintiffs have therefore demonstrated an injury for purposes of the first prong of the standing analysis.[3]

b.     Causation and Redressability

The issues become more difficult and particularized with regard to the second and third prongs.  Though distinct, these prongs share some overlap and are often considered in tandem.  To show causation, a plaintiff must generally demonstrate that his or her injury is "fairly traceable to the defendant's allegedly unlawful conduct and *likely* to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984) (emphasis added) (quoted in *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013)).  This burden is "relatively modest at this stage of the litigation."  *Bennett v. Spear*, 520 U.S. 154, 170–71 (1997).

"The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant."  *Bennett*, 520 U.S. at 168–69; *see also League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011).  And to establish redressability, a plaintiff "need not show that a favorable decision will relieve his every injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (quoted in *K.P. v. LeBlanc*, 627 F.3d 115, 123–24 (5th Cir. 2010) ("*K.P. I*")).  With these basics in mind, the Court turns to the various defendants.

---

[3]Plaintiffs Brittany Rowell and Jessica Harbuck were engaged when the Amended Complaint was filed and therefore ineligible to adopt for this separate reason.  Under the circumstances, they would not have standing.  That said, their counsel sent the Court an email stating that they had been married, but that message is not in the record.  Their claims are dismissed without prejudice.

8

i.    The Governor

Plaintiffs' injuries flow from a statute that prohibits them from adopting; they are not fairly traceable to any act by the Governor of Mississippi.  Indeed, the Governor has represented that he has no authority in this area and has not taken—and will not take—any action to block gay adoption.  Defs.' Mem. [16] at 13, 21.  Plaintiffs cite no adoption-related statutes, rules, or regulations to the contrary.  Instead, Plaintiffs assert that the Governor has made statements against gay adoption and has the authority to appoint department heads, including the DHS Executive Director.

The Fifth Circuit addressed similar claims in *Okpalobi v. Foster*, where the plaintiffs sued the Governor of Louisiana to challenge a statute he had no authority to enforce.  244 F.3d at 426–27.  There, a Louisiana statute created private causes of action against abortion providers in certain contexts.  Abortion providers challenged the statute, naming as defendants the governor and the attorney general.  Similar to the present case, the plaintiffs argued that the governor possessed general enforcement power and the power to appoint relevant state officers.  244 F.3d at 422.  An en banc Fifth Circuit rejected these arguments, finding no standing because the plaintiffs failed to show "that any act of the defendants has caused, will cause, or could possibly cause any injury to them."  *Id.* at 426.  More particularly, the court noted that the state officers lacked the "coercive power" necessary to either cause the injury or redress it.  *Id.* at 426.

Here, Plaintiffs' contentions regarding the Governor of Mississippi are at best strained.  The Governor has no "coercive power" over adoptions and has taken no acts that are fairly traceable to the stated injury.  Even if ordered to do so, he could not affect the adoption process or make a chancery court grant an adoption.  The claims against the Governor are dismissed with

9

prejudice.

ii.     The Attorney General

The claims against the Attorney General are only slightly less attenuated.  According to Plaintiffs, their injuries—the inability to adopt because of section 93-17-3(5)—are fairly traceable to the Attorney General because he issued an advisory opinion citing this section and is now defending its constitutionality in this case.

In February 2012, the Attorney General responded to a question from Mississippi Chancery Court Judge Kenneth M. Burns, who happens to be one of the defendants in this case.  The question read:  "When there are two people of the same gender *who are not a couple*, and who wish to jointly adopt a minor in Mississippi, would this adoption be allowable under Mississippi Code Section 93-17-3?"  *Honorable Kenneth M Burns*, No. 2011-00515, 2012 WL 1071283, at *1 (Miss. A.G. Feb. 3, 2012) (emphasis added).  The Attorney General responded, "Clearly, this statute prohibits adoption by same-sex couples.  You state, however, that the two individuals here are not a 'couple.'"  *Id.*  The opinion then moves to the heart of the inquiry, advising that "Section 93-17-3 prohibits a child from being adopted by two unmarried individuals."  *Id.*

Plaintiffs claim that this opinion, when coupled with the Attorney General's defense of this case, is sufficient to establish standing against him for injuries flowing from section 93-17-3(5).  The Court disagrees for five reasons.  First, the judge did not seek an opinion on this precise issue, so the comments regarding section 93-17-3(5) were dicta.  Second, "opinions issued by the Attorney General are merely advisory and are not binding on courts."  *Godbold v. Water Valley*, 962 So. 2d 133, 135 (Miss. Ct. App. 2007) (citing *Shelter Mut. Ins. Co. v. Dale*,

914 So. 2d 698, 703 (Miss. 2005)).  Third, the opinion occurred before *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  *See Joint Heirs Fellowship Church v. Akin*, No. 14-20630, 2015 WL 6535336, at *5 (5th Cir. Oct. 29, 2015) (rejecting argument that actions before precedent-setting judicial decisions create standing).  Fourth, it is the Attorney General's standard practice to avoid comment on federal law.  *See Kevin Upchurch*, No. 2013-00504, 2013 WL 7020577, at *2 (Miss. A.G. Dec. 20, 2013) ("As you are aware, this office does not opine on such matters that are determinable only under federal law.").  Fifth, the context of Judge Burns's question is not apparent, and technically speaking, judges are not expressly listed among the many state officials who may lawfully request an opinion.  *See* Miss. Code Ann. § 7-5-25.  Counsel for the Attorney General stated that it is, nevertheless, customary to answer questions from judges but not with respect to pending litigation.  In any event, Plaintiffs have not demonstrated that dicta from a pre-*Obergefell* advisory opinion has caused harm or that it carries the requisite "coercive power."  *Okpalobi*, 244 F.3d at 426.

Representing the state in the present litigation does not change that reality.  As noted in *Okpalobi*, the required causal connection comes from an officer's "coercive power" regarding the disputed statute.  244 F.3d at 426 (holding plaintiff must show "power to enforce the complained-of statute").  The duty to defend the state in litigation is not the same thing as the power to enforce a statute.  *Cf. Harris v. Cantu*, No. H-14-1312, 2014 WL 6682307, at *5 (S.D. Tex. Nov. 24, 2014) (holding that attorney general's duty to defend does not trigger *Ex parte Young* exception) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908) (rejecting argument that constitutionality of an act could be challenged by suit against attorney general simply because he "might represent the state in litigation involving the enforcement of its statutes")).  Moreover,

the Attorney General is powerless to affect the adoption process or a decision by a Mississippi chancellor. Plaintiffs' injuries are not fairly traceable to any act by the Attorney General, and he could not redress the actual injury Plaintiffs assert even if he rescinded Opinion No. 2011-00515. The claims against the Attorney General are dismissed with prejudice.

iii.      DHS Executive Director

The claims against the DHS Executive Director are different. As Defendants note, only the chancellors decide whether to apply section 93-17-3(5). Indeed, Defendants have argued correctly that DHS has no statutory authority to grant or deny an adoption. But "[t]his wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 168–69.

Here, DHS has submitted an affidavit verifying that it is charged with responsibilities affecting the adoption process. Smith Decl. I [55-1] ¶ 4. "DHS's particular role, if any, in an adoption proceeding under Mississippi law depends upon the status of the individual whose adoption is at issue" and the type of adoption he or she pursues. *Id.* ¶ 6. There are two basic types of adoption in Mississippi—a private adoption and a foster-care adoption. *Id.* ¶¶ 7–14. Both are at issue in this case, making it necessary to consider Mississippi's adoption procedures as they apply to the various Plaintiff couples. *See Fontenot*, 777 F.3d at 746 (standing must be established for each plaintiff).

a.      Foster-Care Adoption

A foster-care adoption—which is the route Plaintiffs Tina Sweeten-Lunsford and Kari Lunsford plan to take—involves a child who is currently in DHS's foster-care custody. Smith Decl. I [55-1] ¶ 10. Again, the adoption must be approved by a chancery court. *Id.* But foster-

12

care adoptions necessarily involve DHS. *Id.* Generally, this path to adoption includes the following steps: (1) DHS must approve the prospective adopting party's application to become a foster-care resource home; (2) the party must then participate in resource-parent training as well as a home study; (3) the party visits with the foster child; (4) a proceeding is initiated with a court for placement; and (5) if placement occurs, a DHS social worker continues visits to the home for at least six months. *Id.* ¶¶ 11–12.

These procedures raise what may be the only factual dispute before the Court. In the Amended Complaint, Sweeten-Lunsford and Lunsford allege that they began this process but were told they could not participate because they are gay. Am. Compl. [23] ¶¶ 32–33. After the *Obergefell* decision, they contacted DHS to see if they

> would now qualify as foster or adoptive parents. On information and belief, the MDHS employee spoke with [former DHS Executive Director] Berry. The employee then responded that the Mississippi Adoption Ban remained in place despite *Obergefell* and that it remained the law in Mississippi that couples of the same gender cannot adopt. In addition, the MDHS employee told Tina that the only way that MDHS would allow her and her wife to foster or adopt children is through legislative action overturning the Adoption Ban.

*Id.* ¶ 34.

Sweeten-Lunsford explained this episode in greater detail during the evidentiary hearing, testifying that after *Obergefell*, she contacted DHS's Director of Training, who happened to be a friend, to see whether they could now adopt. The friend promised to find out and later stated that there would not be a change in DHS's policy until the law was changed. In yet another communication, that same friend reported that she checked with a caseworker in Sweeten-Lunsford's area who had received a foster-care application from a gay couple but had been instructed to bury the application and wait. This final conversation was approximately two

months before the November 2015 hearing in the present case.

Defendants responded with two declarations from Mark Smith, Director of DHS's Division of Family and Children's Services.  *See* Smith Decl. I [55-1]; Smith Decl. II [55-2]. They did not offer a declaration from Berry, thus leaving the averment regarding his involvement unrebutted in the Amended Complaint.  Am. Compl. ¶ 34.[4]

According to Smith, DHS could find no record of Plaintiffs' efforts and would do nothing to prevent a gay adoption.  More specifically, he stated that DHS would approve an otherwise meritorious foster-care application, Smith Decl. I [55-1] ¶¶ 17–18; *see also* Smith Decl. II [55-2] ¶ 10, and DHS policies would not "exclude [gay couples] from seeking to become a [foster-care] resource parent, or participating in the process for adopting a child."  Smith Decl. II ¶ 4.

The Court concludes that Plaintiffs Sweeten-Lunsford and Lunsford have made a sufficient showing.  As noted, Defendants pursued this motion under Rule 12(b)(1).  And because the record has been supplemented by the parties, the decision must be based on "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Crane*, 783 F.3d at 250–51.  According to the Amended Complaint, DHS conveyed its continued policy to enforce section 93-17-3(5).  Smith's affidavit merely states that DHS has no record of the call.  And while it would be difficult for DHS to prove a negative, Sweeten-Lunsford's testimony was credible and is accepted.

Counsel for Defendants acknowledged during argument that if the Court credits Plaintiffs' version of these facts, standing would exist for Plaintiffs desiring foster-care

---

[4]Regardless, Berry was sued in his official capacity, so the issue is DHS's policies and actions.

adoptions.  The Court agrees.  Even with Smith's post-suit assurance that DHS will not block

gay adoptions, "[a] defendant cannot automatically moot a case simply by ending its unlawful

conduct once sued."  *Already, LLC*, 133 S. Ct. at 727 (citation omitted).  Therefore, "a defendant

claiming that its voluntary compliance moots a case bears the formidable burden of showing that

it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."

*Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 190

(2000)) (internal quotation marks omitted).  That showing has not been made given DHS's

refusal to process foster-care applications just two months before the hearing.

Having found that DHS has frustrated gay adoptions through the foster-care procedures,

the Court finds Plaintiffs desiring foster-care adoption have standing.  The foster-care

application is the first step in the path to this type of adoption, DHS is solely responsible for

administering it, and there is evidence that DHS has recently withheld approval based on section

93-17-3(5).  The barrier need not be "the very last step in the chain of causation."  *Bennett*, 520

U.S. at 168.  Nor must it resolve "every injury."  *Larson*, 456 U.S. at 243 n.15 (quoted in *K.P. I*,

627 F.3d at 123–24).[5]  Finally, if DHS has authority to erect a barrier to foster-care adoption

based on section 93-17-3(5), it likewise has the ability to remove that barrier if so ordered.  *See,*

*e.g.*, *K.P. v. LeBlanc*, 729 F.3d 427, 437 (5th Cir. 2013) ("*K.P. II*") (finding standing as to state

board because it had enforcement authority sufficient to redress at least some of plaintiff's

injuries).

---

[5]Though not the focus of the argument, DHS can be involved in subsequent steps in the
foster-care adoption context, including placement.  State of Miss., Dep't of Human Servs., Div.
of Family & Children's Servs., Adoption Policy ("Adoption Policy"), at 7 (Apr. 29, 2015),
*available at* http://www.mdhs.state.ms.us/media/310797/dfcs_policy_section_g.pdf.

b.      Private Adoptions

Private adoptions involve children who are not in DHS's foster-care custody.  For
example, Plaintiffs Donna Phillips, Janet Smith, Kathryn Garner, and Susan Hrostowski are
already raising the biological child of one of the two partners.  Section 93-17-11 states that after
a private-adoption petition is filed, the chancellor may order an investigation and shall order a
home study where the petitioner is not a stepparent.  Where the petitioner is a relative or
stepparent, the chancellor has discretion whether to order a home study.  *Id.*  Home studies are
governed by section 93-17-3(6), which provides:

> No person may be placed in the home of or adopted by the prospective adopting
> parties before a court-ordered or voluntary home study is satisfactorily completed
> by a licensed adoption agency, a licensed, experienced social worker approved by
> the chancery court *or* by the Department of Human Services on the prospective
> adoptive parties if required by Section 93-17-11.  (Emphasis added).

Under these statutes, there are circumstances in which DHS could directly enforce the
gay-adoption ban—if it so desired—with respect to a home study.  But as DHS observes, the
statutes also provide other avenues to adoption that do not directly involve home surveys by
DHS, and in fact, DHS has never been asked to perform a home study involving a married gay
couple.  Smith Decl. I ¶ 8.

Accepting those statements as true, other evidence must also be considered.  To begin
with, there can be no serious dispute that DHS—by statute—plays an expansive role in the
adoption process.  DHS's own policy manual correctly states that it is "the agency designated, by
MISS CODE ANN § 93-17-31 [sic] through 93-17-31 for establishing procedures for handling

adoptions within Mississippi." Adoption Policy at 4.[6] Pursuant to that duty, DHS has published

a written "Adoption Policy" manual, which is nearly 100 pages and fully explains its policies

and the numerous roles DHS plays in the adoption process.

One of those policies prohibits discrimination and states that "[a]doption services and

resources for children will be provided without discrimination and such services cannot be based

on race, color, national origin or religious affiliation." *Id.* But the policy does not preclude

discrimination against same-sex married couples. And, as stated above, there is an allegation

that DHS's policy of enforcing section 93-17-3(5) remained unchanged after *Obergefell*. *See*

*supra*.

With respect to the private-adoption plaintiffs, Plaintiffs Donna Phillips and Janet Smith

contend that DHS has impeded their efforts to obtain a voluntary home study as provided in §

93-17-3(6). According to them,

> every single social worker they have tried to engage to perform a home study has
> refused, citing the Mississippi Adoption Ban. *See* Miss. Code Ann. § 93-17-3(6).
> Several social work agencies told Donna and Jan that not only would a home
> study for a gay couple trying to adopt in Mississippi be useless, but they feared it
> would endanger their organizations' standing with the State of Mississippi.

Am. Compl. ¶ 18. It is important to note that DHS is tasked with licensing the adoption

agencies. Miss. Code Ann. § 93-17-203(f). And DHS's "general functions" include "[s]erving

as a consultant to agencies providing adoption services." Adoption Policy at 7.

At this stage of the case, Plaintiffs need not prove that these assertions are true. *Gilbert*

*v. Donahoe*, 751 F.3d 303, 312 (5th Cir. 2014). Plaintiffs bear the burden of establishing the

---

[6]Defendants provided the link to the website containing DHS's policy manual in their
brief. *See* Defs.' Mem. [21] at 3 n.1.

elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 560.  At the pleading stage, the Court considers "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Crane*, 783 F.3d at 250–51.  Unless disputed, the averments in the Amended Complaint must be presumed true. *Lujan*, 504 U.S. at 560.  Or, as stated in *Bennett*, Plaintiffs have the burden—which is "relatively modest at this stage of the litigation—of alleging that their injury is 'fairly traceable' to the [defendant] and that it will 'likely' be redressed . . . ." 520 U.S. at 171.

So the question is whether these facts plausibly demonstrate that Plaintiffs' injuries are "fairly traceable" to DHS's actions.  The contours of that standard can become murky on the fringes.  It is clear, for example, that when a plaintiff cannot show that a defendant "has caused, will cause, or could possibly cause any injury to" her, the causation prong is not met.  *Okpalobi*, 244 F.3d at 426.  In *Okpalobi*, the plaintiffs sued the governor and attorney general of Louisiana, but those state officers simply had no involvement whatsoever in the enforcement of the statute, so no standing existed.  *Id.*; *see also K.P. II.*, 729 F.3d at 437–38 (finding no standing where defendant lacked authority to enforce statute and therefore could not redress harm).[7]

In *K.P. I*, the Fifth Circuit faced a statute that could—but did not necessarily—implicate the defendant.  Louisiana's Medical-Malpractice Act created a fund for participating doctors who had been sued for malpractice.  But section 9:2800.12 of the Louisiana Revised Statues excluded abortion providers from the fund for lawsuits over abortion-related procedures.  The fund was administered by the Patients' Compensation Fund Oversight Board (the "Board").  627

---

[7]*Okpalobi*'s observation that the plaintiffs failed to show the defendant "could possibly cause any injury to them" may be dicta given the facts of the case.  If not, then the present dispute would meet that test for the reasons that follow.

F.3d at 119.  When the Board denied a claim related to an abortion, the provider and others sued,

bringing both a facial and as-applied challenge to section 9:2800.12.  The Fifth Circuit found

standing at the Rule 12(b) stage:

> We acknowledge that the Board is far from the sole participant in the application
> of the challenged statute.  For example, litigants may bypass the Board and
> proceed directly in the courts.  But at several points, Section 9:2800.12 impacts
> the Board's actions sufficiently to confer standing on these Plaintiffs. "A plaintiff
> satisfies the redressability requirement when he shows that a favorable decision
> will relieve a discrete injury to himself.  He need not show that a favorable
> decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15,
> 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982). This distinguishes the Board's role from
> that of the Governor and Attorney General in *Okpalobi*.  Those two officials were
> found not to have "any duty or ability to do anything" relating to enforcement of
> the statute.  *Okpalobi*, 244 F.3d at 427.  Here, the Board has definite
> responsibilities relating to the application of Section 9:2800.12.

627 F.3d at 123–24 (internal punctuation altered); *see also Toll Bros., Inc. v. Township of*

*Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (holding that causation "need not be as close as

the proximate causation needed to succeed on the merits of a tort claim.  Rather, an indirect

causal relationship will suffice, so long as there is 'a fairly traceable connection between the

alleged injury in fact and the alleged conduct of the defendant'" (quoting *Vt. Agency of Nat. Res.*

*v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)) (additional citations omitted); *see also Bennett*,

520 U.S. at 168 (holding that "fairly traceable" is not the same as "proximate cause" for standing

purposes).

Here, DHS has far more authority over adoptions than the officers in *Okpalobi*.  In fact,

its policy-making authority, failure to include gay adoption in its anti-discrimination policy, and

alleged policy of enforcing section 93-17-3(5) is sufficient when considered with the alleged

coercive impact on those who perform voluntary home inspections.

For example, in *Ivy v. Williams*, deaf individuals brought a putative class action against the Texas Education Agency ("TEA"), seeking injunctive relief that would require TEA to bring driver-education schools into compliance with the Americans with Disabilities Act (ADA). 781 F.3d 250 (5th Cir. 2015). The TEA argued that "no causal connection [existed] between the named plaintiffs' injury and the TEA's conduct because it is the driver education schools, not the TEA, that refuse to accommodate the named plaintiffs." *Id.* at 253. The Fifth Circuit found the contention "meritless." *Id.* "While driver education schools' actions are one cause of the injury, it is equally clear that the named plaintiffs' alleged injuries are also 'fairly traceable' to the TEA's failure to inform private driver education schools of their ADA obligations and its failure to deny licenses to driver education schools that violate the ADA." *Id.*

The fairly-traceable standard may include "injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169. And because DHS can both directly and through coercion impede a private adoption based on section 93-17-3(5), the Court concludes at this stage that an injunction would likely redress alleged injuries. Therefore, Plaintiffs Phillips, Smith, Garner, and Hrostowski have established standing.

### c.    Organizational Plaintiffs

Finally, the remaining Plaintiffs—the Campaign for Southern Equality and Family Equality Council—are advocacy groups committed to supporting gay rights that allege they have associational standing to sue on behalf of their Mississippi members and constituents. "Associational standing is a three-part test:  (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief

requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459

F.3d 582, 587 (5th Cir. 2006).  Neither side has briefed the associational-standing issue in great

detail.  *See* Defs.' Mem. [56] at 11 n.6; Pls.' Mem. [58] at 7 n.4.  Given the Court's finding that

various Plaintiffs have standing, the Court concludes that the organizational Plaintiffs have

standing, too, as their "mission[s are] aligned with [their] goals in this suit" and "[a]dditional

members [or constituents] need not participate because the questions presented are legal, not

factual."  *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 918 (S.D. Miss. 2014).

B.     Eleventh Amendment Immunity

"The Eleventh Amendment grants a state immunity from suit in federal court by . . . its

own citizens."  *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002).

Immunity also extends to state agencies that are considered "arms of the state."  *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 70 (1989).  Finally, "a suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office."

*Will*, 491 U.S. at 71.  Therefore, the Eleventh Amendment also bars federal-court claims against

individual state employees acting in their official capacities.  *Id.*

As stated, no standing exists as to the Governor or the Attorney General.  There is,

therefore, a school of thought that would counsel against conducting an Eleventh Amendment

analysis as to them.  *See Okpalobi*, 244 F.3d at 429 (Higginbotham, J., dissenting in part).   But

given the early stage of this litigation, the Court will briefly address the issue as an alternative

basis for dismissing the official-capacity claims against the Governor and Attorney General.

*Ex parte Young* acknowledged the "convenien[ce]" and "speed[]" that would be achieved

in allowing suits against governors and attorneys general to test the constitutionality of statutes.

21

209 U.S. at 157.  But it nevertheless held that a plaintiff must show the defendants "have the requisite 'connection' to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State."  *Okpalobi*, 244 F.3d at 411.  "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists."  *Ex Parte Young*, 209 U.S. at 157.

What constitutes a connection to the enforcement of the statute is not entirely clear. *Okpalobi* required a "close connection" or "special relation."  244 F.3d at 413.  But that portion of the opinion failed to convince a majority of the court.  Later, in *K.P. I*, the Fifth Circuit noted that "'[e]nforcement' typically involves compulsion or constraint."  627 F.3d at 124–25 (citing Webster's Third New International Dictionary 751 (1993)).  And this "required 'connection' is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question *and a demonstrated willingness* to exercise that duty.'" *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (emphasis added) (citing *Okpalobi*, 244 F.3d at 414–15 (quoting *Ex parte Young*, 209 U.S. at 157, 158)).

In this case, neither Mississippi's Governor nor its Attorney General have the power of compulsion or constraint over the adoption decisions at issue.  Moreover, they have not "demonstrated a willingness to exercise that duty."  *Id.*  In fact, both the Governor and the Attorney General have unequivocally informed the Court in their memoranda that they are powerless to affect the adoption decision and will take no action to interfere with these Plaintiffs' pursuit of an adoption.

While Plaintiffs observe that the Attorney General is representing the state in this

22

litigation, again, that is not enough.  *See Harris*, 2014 WL 6682307, at *5 (holding that "issuing

opinions on the constitutionality of state law . . .  and defending challenges to state laws"

insufficient to trigger *Ex parte Young*).  Under these circumstances, neither the Governor nor the

Attorney General fall within the *Ex parte Young* exception to Eleventh Amendment immunity.

The DHS Executive Director is different.  As noted above, DHS is statutorily empowered

to set policies and participate directly in the adoption process.  And the record before the Court

indicates that it has interfered with same-sex adoptions after *Obergefell*.  Thus, the power to

"constrain[] exists, and there has been a demonstrated willingness to exercise it."  *Morris*, 739

F.3d at 746.  So as to DHS's Executive Director, Plaintiffs have standing and an *Ex parte Young*

claim.

II.     Plaintiffs' Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain this relief, Plaintiffs must

demonstrate four familiar requirements:

> (1) [a] substantial likelihood of success on the merits; (2) [a] substantial threat
> that plaintiff[s] will suffer irreparable injury; (3) [that the] injury outweighs any
> harm the injunction might cause the defendant[s]; and (4) [that the] injunction is
> in the public interest.

*Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).

A.      Likelihood of Success on the Merits

*Obergefell* held that bans on gay marriage violate the due-process and equal-protection

clauses.  It is the equal-protection component of the opinion that is relevant in the present dispute

over Mississippi's ban on gay adoptions.  Under traditional equal-protection analysis, a law that

does not "target[ ] a suspect class" or involve a fundamental right will be upheld, "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Conversely, "if a classification does target a suspect class or impact a fundamental right, it will be strictly scrutinized and upheld only if it is precisely tailored to further a compelling government interest." *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007) (citation omitted).

In this case, Defendants argue that rational-basis review applies.  But *Obergefell* made no reference to that or any other test in its equal-protection analysis.  That omission must have been consciously made given the Chief Justice's full-throated dissent.  135 S. Ct. at 2623 (Roberts, C.J., dissenting) ("Absent from this portion of the opinion, however, is anything resembling our usual framework for deciding equal protection cases . . . .").

While the majority's approach could cause confusion if applied in lower courts to future cases involving marriage-related benefits, it evidences the majority's intent for sweeping change. For example, the majority clearly holds that marriage itself is a fundamental right when addressing the due-process issue.  *Id.* at 2602.  In the equal-protection context, that would require strict scrutiny.  But the opinion also addresses the benefits of marriage, noting that marriage and those varied rights associated with it are recognized as a "unified whole."  *Id.* at 2600.  And it further states that "the marriage laws enforced by the respondents are in essence unequal:  same-sex couples are denied all the *benefits* afforded to opposite-sex couples *and* are barred from exercising a fundamental right."  *Id.* at 2604 (emphasis added).

Of course the Court did not state whether these other benefits are fundamental rights or whether gays are a suspect class.  Had the classification not been suspect and the benefits not

24

fundamental, then rational-basis review would have followed. It did not. Instead, it seems clear the Court applied something greater than rational-basis review. Indeed, the majority never discusses the states' reasons for adopting their bans on gay marriage and never mentions the word "rational."

While it may be hard to discern a precise test, the Court extended its holding to marriage-related benefits—which includes the right to adopt. And it did so despite those who urged restraint while marriage-related-benefits cases worked their way through the lower courts. According to the majority, "Were the Court to stay its hand to allow slower, case-by-case determination of the required *availability of specific public benefits to same-sex couples*, *it still would deny gays and lesbians many rights and responsibilities intertwined with marriage*." *Id.* at 2606 (emphasis added).

The full impact of that statement was not lost on the minority. Chief Justice Roberts first took issue with the majority's failure to "note with precision which laws petitioners have challenged." *Id.* at 2623 (Roberts, C.J., dissenting). He then criticized the majority for jumping the gun on marriage-related cases that might otherwise develop:

> Although [the majority] discuss[es] some of the ancillary legal benefits that accompany marriage, such as hospital visitation rights and recognition of spousal status on official documents, petitioners' lawsuits target the laws defining marriage generally rather than those allocating benefits specifically. . . . Of course, *those more selective claims will not arise now* that the Court has taken the drastic step of requiring every State to license and recognize marriages between same-sex couples.

*Id.* at 2623–24 (Roberts, C.J., dissenting) (emphasis added).

In sum, the majority opinion foreclosed litigation over laws interfering with the right to marry and "rights and responsibilities intertwined with marriage." *Id.* at 2606. It also seems

highly unlikely that the same court that held a state cannot ban gay marriage because it would

deny benefits—expressly including the right to adopt—would then conclude that married gay

couples can be denied that very same benefit.[8]

     *Obergefell* obviously reflects conflicting judicial philosophies.  While an understanding

of those positions is necessary for this ruling, it is not this Court's place nor intent to criticize

either approach.  The majority of the United States Supreme Court dictates the law of the land,

and lower courts are bound to follow it.  In this case, that means that section 93-17-3(5) violates

the Equal Protection Clause of the United States Constitution.

     2.     Irreparable Injury

     "An injury is 'irreparable' only if it cannot be undone through monetary remedies."

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *see also*

*Spiegel v. City of Hous.*, 636 F.2d 997 (5th Cir. 1981).  Defendants contend that Plaintiffs' injury

is not irreparable, in part because only an adoption decree will remedy Plaintiffs' damages.

Defs.' Mem. [21] at 19.  But "[d]iscriminatory treatment at the hands of the government is an

injury 'long recognized as judicially cognizable.'"  *Tex. Cable & Telecomm. Ass'n v. Hudson*,

265 F. App'x 210, 218 (5th Cir. 2008) (quoting *Heckler v. Mathews*, 465 U.S. 728, 738 (1984)).

And while Plaintiffs must undergo the adoption process to fully remedy their injuries, the current

law imposes an unconstitutional impediment that has caused stigmatic and more practical

injuries.  Plaintiffs addressed these concerns in their testimony and Amended Complaint, and

---

[8]During oral argument, the Court gave Defendants an opportunity to address the Supreme Court's apparent desire to include marriage-related benefits in its *Obergefell* decision.  Counsel seemed to acknowledge the point and redirected the Court to the procedural defenses.  *See* Tr. at 157.

Defendants have not demonstrated that they could be undone with a monetary award.  The Court finds irreparable harm.

       3       Balance of Harms

Plaintiffs have also met their burden regarding the balance of harms.  DHS has taken the position, through its Director of the Division of Family and Children's Services, that it will not impede an otherwise valid gay adoption, so this ruling merely memorializes what DHS has promised.

       4.      Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (cited with approval in *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 470 n.9 (5th Cir. 2014)).

III.    Conclusion

For the reasons stated, the Court grants the Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim [52] filed by Defendants the Tenth, Fourteenth, and Twentieth District Chancery Courts and Judges Dawn Beam, M. Ronald Doleac, Deborah J. Gambrell, Johnny L. Williams, Kenneth M. Burns, Dorothy W. Colom, Jim Davidson, John Grant, and John C. McLaurin, Jr.  The following motions are granted in part:  (1) the Motion for Preliminary Injunction [13] as to Defendant Davis; and (2) the Motions to Dismiss for Lack of Subject Matter Jurisdiction [15, 55] as to Plaintiffs Brittany Rowell and Jessica Harbuck and Defendants DHS, Governor Phil Bryant, and Attorney General Jim Hood.

The Executive Director of DHS is hereby preliminarily enjoined from enforcing

Mississippi Code section 93-17-3(5).

**SO ORDERED AND ADJUDGED** this the 31ˢᵗ day of March, 2016.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE